## AFFIDAVIT

I, Christopher May, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.        I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), assigned to the DEA's Burlington Resident Office (BRO). I am currently employed with the Essex Police Department and have been since 2009. Presently, I am assigned to the Detective Bureau. I completed the Basic Training Course at the Vermont Police Academy and graduated in 2006. I have attended specialized trainings dealing with drug investigations and drug trafficking, including the DEA basic narcotic investigation school. I have been involved in numerous drug investigations leading to the arrest and conviction of subjects. I have participated in the execution of numerous search warrants leading to the recovery of controlled substances. I have written affidavits in support of search and arrest warrants, and I frequently use the services of informants and other confidential sources of information. In the course of my work, I have gained an understanding of current technology, including smartphones, for the purpose of solving and proving crimes.

2.        I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two cellular phones described in Attachment A (Target Devices) and the extraction of electronically stored information from the Target Devices consistent with Attachment B. As described below, the Target Devices are associated with Kylee RADUECHEL.

3.        As described below, there is probable cause to believe that in 2020 Kylee RADUECHEL possessed with intent to distribute, distributed, and conspired to distribute controlled substances, including heroin/fentanyl and cocaine base, in violation of 21 U.S.C.

§§ 841 and 846, and that the Target Devices constitute instrumentalities of those crimes and contain evidence of those crimes, in the form of the electronically-stored data particularly described in Attachment B.

4.       The information contained within this affidavit is based upon my own training, experience, and investigation, as well as information conveyed to me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of securing the requested warrant, I have not included every fact known to me concerning this investigation.

<u>IDENTIFICATION OF THE DEVICES TO BE EXAMINED</u>

5.       One of the Target Devices is a black cellular telephone bearing IMEI number 351766111601168 (Target Device 1).  Target Device 1 is currently in DEA custody in the BRO in South Burlington, Vermont.

6.       The second of the Target Devices is a black flip-style cellular telephone labeled Alcatel with a white apple sticker (Target Device 2). Target Device 2 is also in DEA custody in the BRO in South Burlington, Vermont.

<u>PROBABLE CAUSE</u>

7.       On November 11, 2020, an anonymous female reported the following information to the South Burlington Police Department (SBPD) regarding Kylee RADUECHEL. RADUECHEL was residing at the Travel Lodge, located at 1016 Shelburne Road, Room 121, selling heroin and cocaine base. RADUECHEL was trading heroin and cocaine base for stolen merchandise. Two of the items traded to RADUECHEL were a bedsheet and perfume. RADUECHEL was then on federal probation.

8.       I am familiar with RADUECHEL as I participated in a narcotics investigation resulting in RADUECHEL's federal conviction for conspiracy to distribute cocaine base and

heroin. In that case, RADUECHEL pleaded guilty to conspiring with her then-boyfriend, Bryant McCray, and others to distribute cocaine base and heroin in the Burlington area during 2016 and 2017.

9.      I have reviewed a United States Probation Office memorandum dated November 16, 2020, concerning RADUECHEL's alleged violations of supervised release. This memorandum states that RADUECHEL was on federal supervised release after the court granted her motion for compassionate release in on June 22, 2020. The memorandum further states that RADUECHEL was living in Room 121 at the South Burlington Travel Lodge in November 2020.

10.     Based on my conversations with SBPD officers and my review of SBPD reports I have learned the following: SBPD Officers arrived at the Travel Lodge on November 11, 2020 and met with staff who confirmed that Room 121 was registered to RADUECHEL. Travel Lodge staff also reported a lot of "foot traffic" to and from RADUECHEL's room. The staff intended to speak with RADUECHEL about the issue. SBPD officers decided to address these complaints with RADUECHEL and headed to her room. While walking to RADUECHEL's room, the officers observed a car arrive at a nearby bank parking lot. The officers recognized the driver as Lawrence Ritchie. They saw a passenger, later identified as Amanda Bean, get out of the car and walk to Room 121. Bean carried a clear garbage bag, which was later determined to contain clothing with price tags attached. Bean knocked on Room 121 but departed after a guest of the hotel informed her that police were there. SBPD Officer Aaron Dince spoke with Ritchie at the car and saw track marks on his arm. Bean was approached by SBPD Corporal Monroe, who informed Bean she could see stolen merchandise in Bean's

possession. Bean refused to show Corporal Monroe the bag of clothing and walked back to the vehicle parked at the bank parking lot.

11.     SBPD Corporal Keller arrived with K-9 Rush and conducted an exterior sniff of Room 121 and the vehicle at the bank parking lot. SBPD Keller said that K-9 Rush alerted on Room 121 and the vehicle at the bank parking lot. SBPD Officers conducted a protective sweep of Room 121 and secured it to obtain a warrant. No one was in Room 121 at the time the room was secured. The vehicle at the bank parking lot was also seized. Bean then told SBPD officers that she was going to RADUECHEL's room to exchange "clothing." Bean granted consent to a search of a purse inside the car. Located inside the purse was a pipe used to smoke cocaine base.

12.     SBPD officers obtained search warrants for the car driven by Ritchie and for Room 121. A search of Room 121 yielded suspected cocaine base, suspected heroin, suspected cocaine HCL, and other suspected controlled substances. SBPD Officer Dince noted that the suspected drugs were found near RADUECHEL's property, such as her mail, Visa debit card, and U.S. Probation client card.  Also located inside the room were perfume, bedding, and articles of clothing with tags. RADUECHEL was charged with state drug offenses in connection with the seizure from her hotel room. I have attached a copy of the affidavit in support of the arrest as Exhibit 1 and adopt the statements there for purposes of this affidavit.

13.     The Probation memorandum referenced above further stated that RADUECHEL called her Probation Officer on November 15, 2020, after SBPD had spoken with RADUECHEL about turning herself in based on the state arrest warrant. A U.S. Probation Officer told RADUECHEL to turn herself in to the police. At around the same time, the U.S. Probation Office obtained a federal arrest warrant based on RADUECHEL's alleged violations of supervised release. RADUECHEL did not turn herself in on the state charge.

4

14.     I have spoken with Massachusetts law enforcement officers and reviewed Massachusetts State Police (MSP) reports concerning the arrest of RADUECHEL by the MSP on December 1, 2020. Based on those sources I have learned the following:  MSP Trooper Dane Jobst saw a car speeding on Route 91, and pulled the car over in West Springfield, Massachusetts. Trooper Jobst spoke with the driver, who said her name was Katie Merriem. Trooper Jobst, through further investigation, discovered the driver was RADUECHEL. She was arrested based on the Vermont warrant. During an inventory search of the car, buprenorphine was found in a wallet containing RADUECHEL's Vermont identification. Traveling with RADUECHEL was Jeremiah Hines. RADUECHEL said she had known him for a few years but did not know his last name. Trooper Jobst also saw an android cell phone (Target Device 1) in RADUECHEL's hand and a flip-style phone (Target Device 2) in the vehicle's center console, where RADUECHEL's wallet was found. Both phones were processed as RADUECHEL's property. Hines was not arrested. He also had two cell phones. Both RADUECHEL and Hines denied ownership of Target Device 2.

15.     Trooper Jobst transported RADUECHEL to the MSP barracks in Springfield for booking. Trooper Jobst left RADUECHEL secured in the booking room. When he returned to the booking room a short time later, he saw many glassine bags containing suspected heroin under the bench where RADUECHEL was sitting. RADUECHEL admitted that she had body-packed the bags and that they contained heroin. When asked if she had anything else, RADUECHEL said that she had more cocaine and heroin inside her body. RADUECHEL then voluntarily surrendered additional suspected heroin and cocaine from her person. RADUECHEL admitted that she purchased all the drugs in New Haven, Connecticut for $2,100. This incident

resulted in the seizure of nine suspected buprenorphine strips, approximately 270 bags of

suspected heroin, and approximately 26.4 grams of suspected cocaine.

16.     Trooper Jobst transferred RADUECHEL to the Western Massachusetts

Regional Women's Correctional Center in Chicopee, Massachusetts. Trooper Jobst also

transferred the Target Devices to the same facility as RADUECHEL's property. On December 8,

2020, I served that facility with a subpoena for the Target Devices and took the Target Devices

into my custody, transporting them back to Vermont, where I logged them as evidence.

17.     Through my training and experience I have learned that cellular telephones

play in integral role in the procurement and distribution of drugs.  Cellular telephones also retain

information, including the kinds of data described in Attachment B. Moreover, I have learned

that drug traffickers often possess and use more than one phone, with one phone used to

communicate with customers (sometimes called a customer phone), and another phone or phones

used for more personal matters. Often, drug traffickers use inexpensive flip phones as customer

phones. The incidents investigated by SBPD and MSP show RADUECHEL's recent

involvement in both the procurement and distribution of drugs, including at the time

RADUECHEL possessed and had access to the Target Devices.  Accordingly, there is probable

cause to believe evidence of those activities will be found on the Target Devices.

### ADDITIONAL INFORMATION ABOUT NARCOTICS TRAFFICKERS

18.     Based on my training and experience, I know the following:

a.      People who participate in the distribution of controlled substances frequently

use cellular telephones, among other devices, to coordinate their unlawful activities and to

maintain contact with suppliers and consumers of illegal drugs.

b.        Information stored on these devices constitutes evidence of drug trafficking. Among other things, this evidence may include the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain Global Positioning System (GPS) or other location information indicating where the devices have traveled.

c.        With their cellular phones, drug dealers often take photographs or videos of drugs, drug paraphernalia, other members of their organizations, cash and assets obtained from profits of drug sales, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of a cellular phone.

d.        Data contained in a cellular telephone may reveal the physical location of the cellular telephone at various times. For example, the latitude and longitude of the camera at the time it takes a photograph may be contained in the metadata associated with the photograph. Also, if a cellular telephone has GPS capabilities, which many do, additional information regarding locations of the cellular telephone, while it follows GPS directions, may be recovered from the device.

19.        Based on my knowledge and experience and direct participation in investigations into the distribution of controlled substances, including heroin, fentanyl, and cocaine base, I also know that:

a.        Distribution of controlled substances can be lucrative, and individuals who engage in such conduct are capable of amassing tens of thousands of dollars or more in a short

period of time and often physically retain such currency for long periods of time, even after their distribution activity has ceased;

      b.    It is common for sellers of controlled substances to put bank accounts, assets, and cell phones in the names of associates or under fictitious names to avoid detection and to conceal illegitimate income;

      c.    Controlled substance traffickers maintain and access books, records, receipts, bills of sale, notes, ledgers, computer software, airline tickets, money orders, and other records relating to the transportation, acquisition, and distribution of controlled substances and proceeds, and much of this information is commonly stored electronically in cellular telephones and other electronic devices capable of storing electronic data;

      d.    People engaged in criminal activity often spend the proceeds of their criminal activity and maintain or access records of their expenditures on their cellular telephones long after their criminal activity has ceased. They also maintain electronic records reflecting communication with their criminal associates. Specifically, these records may include the following:

      i.    Records of income and expenses, such as profit and loss statements and income and expense journals that reflect the expenditure of the proceeds of criminal activity;

      ii.    Evidence of the expenditure of the proceeds of criminal activity or purchase of assets with the proceeds of criminal activity, such as invoices, receipts, rental statements, lease statements, travel records, earnest money agreements, escrow statements, and real estate deeds;

      iii.    Records of the accumulation of assets acquired with the proceeds of criminal activity, such as ledgers, balance sheets and financial statements, reflecting both assets and liabilities;

iv.      Checking and savings account records consisting of monthly statements, duplicate

deposit slips, and canceled checks reflecting the deposit and disbursement of the proceeds of

criminal activity;

v.      Letters and other documents reflecting communications between partners or

associates, such as address and phone books reflecting the names and addresses of partners or

associates, phone billing records reflecting telephone activity, contracts and other agreements

reflecting associations between individuals regarding business ventures, and cashier's checks,

money orders, and wire transfers that are evidence of transactions involving the proceeds of

criminal activity; and

vi.      Drug traffickers frequently take, or cause to be taken, photographs of themselves,

their associates, their property, and their product. These traffickers may maintain these

photographs electronically in their cellular telephones. I know, based on my training and

experience, that unexplained wealth is evidence of crimes including trafficking in controlled

substances.

<u>TECHNICAL TERMS</u>

20.      Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.      Cellular telephone: a cellular telephone (or mobile telephone, or wireless

telephone) is a handheld wireless device used for voice and data communication through radio

signals. These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones. A cellular

telephone usually contains a "call log," which records the telephone number, date, and time of

calls made to and from the phone. In addition to enabling voice communications, cellular

telephones offer a broad range of capabilities. These capabilities include: storing names and

phone numbers in electronic "address books;" sending, receiving, and storing text messages and

e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments, and other information on personal

calendars; and accessing and downloading information from the Internet. Most cellular

telephones run computer software, giving them many of the same capabilities as personal

computers. For example, PDA users can work with word-processing documents, spreadsheets,

and presentations. Cellular telephones may also include global positioning system ("GPS")

technology for determining the location of the device.

      b.     GPS: the Global Positioning System (generally abbreviated "GPS") consists of 24

NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.

Each satellite repeatedly transmits by radio a mathematical representation of the current time,

combined with a special sequence of numbers. These signals are sent by radio, using

specifications that are publicly available. A GPS antenna on Earth can receive those signals.

When a GPS antenna receives signals from at least four satellites, a computer connected to that

antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude

with a high level of precision. A GPS navigation device uses the Global Positioning System to

display its current location. It often contains records of the locations where it has been. Some

GPS navigation devices can give a user driving or walking directions to another location. These

devices can contain records of the addresses or locations involved in such navigation.

      c. .    IP Address: an Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series of numbers and/or

letters (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP

address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        d.      Internet: the Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        21.      Based on my training, experience, and research, I know that the Target Devices most likely have capabilities that allow them to serve as a smart phone, digital camera, GPS navigation device, and access the Internet, among other things. In my training and experience, examining data stored on such devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

ELECTRONIC STORAGE AND FORENSIC ANALYSIS

        22.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

        a.      Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes referenced above, but also forensic evidence that establishes how the Target Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Devices because:

11

     i.     Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

     ii.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

     iii.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

     iv.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or cellular telephone is evidence may depend on other information stored on such a device, and the application of knowledge about how such a device operates. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     v.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

     b.     Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

c.        Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Thus, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

<u>CONCLUSION</u>

23.        Based on the foregoing, I believe that probable cause exists to search the Target Devices for the evidence described in Attachment B.


Christopher May
Task Force Officer, Drug Enforcement Administration

Sworn to and subscribed before me this ___11___ day of December, 2020.


JOHN M. CONROY
United States Magistrate Judge

13